IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No.: 23-CR-00417 (APM) |
| v. | : | 18 U.S.C. §§ 111(a)(1) and (b) |
| RICHARD MARKEY, | : | (Assaulting Certain Officers Using Dangerous Weapon) |
| Defendant. | : | |

## STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Richard Markey, with the concurrence of the defendant's attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### *The Attack at the U.S. Capitol on January 6, 2021*

1. The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2. On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public. The grounds around the Capitol were posted and cordoned off, and the entire area as well as the Capitol building itself were restricted as that term is used in Title 18, United States Code, Section 1752 due to the fact that the Vice President and the immediate family of the Vice President, among others, would be visiting the Capitol complex that day.

3. On January 6, 2021, a joint session of the United States Congress convened at the Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday, November 3, 2020. The joint session began at approximately 1:00 PM. Shortly thereafter, by approximately 1:30 PM, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4. As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside. By shortly after 1:00 PM, the situation at the Capitol had become a civil disorder as that term is used in Title 18, United States Code, Section 231, and throughout the rest of the afternoon the civil disorder obstructed the Secret Service's ability to perform the federally protected function of protecting Vice President Pence.

5. At approximately 2:00 PM, certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. Officers with the D.C. Metropolitan Police Department were called to assist officers of the USCP who were then engaged in the performance of their official duties. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials.

6. At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 PM, individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $2.9 million dollars for repairs.

7. Shortly thereafter, at approximately 2:20 PM, members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 PM on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 PM after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *The Defendant's Participation in the January 6, 2021, Capitol Riot*

8. Richard Markey, an HVAC technician living in Connecticut, traveled to Washington, D.C., on January 5, 2021. That evening, he met with several individuals, including co-defendant Michael Tyler Roberts.

9. The following day, the defendant went to the United States Capitol building along with thousands of other rioters. Beginning at approximately 2:42 p.m., rioters began to enter the Lower West Terrace ("LWT") tunnel and attack the officers there. Rioters shattered the glass and forced open the doors that led into the Capitol building. In response, officers from both the United States Capitol Police ("USCP") and the Metropolitan Police Department ("MPD") formed a police line blocking entrance into the Capitol. Numerous rioters sought to breach the police line that formed in the tunnel. The rioters used various weapons, as well as the force of their bodies, to attempt to overcome the officers. Many of the rioters assaulted USCP and MPD officers by hurling objects at them, physically striking them with batons and other blunt instruments, using lights to distract and disorient the officers, shocking them with electrical devices, crushing them between the doors and walls in the confined space, and spraying chemical irritants and fire extinguishers at them. Between approximately 3:21 p.m. and 3:54 p.m., law enforcement officers maintained a police line at the mouth of the tunnel while rioters continuously sought to push through the line and to assault the officers defending the U.S. Capitol building.

10. The defendant made his way across the West plaza, up to the LWT, and to the mouth of the tunnel. Beginning at approximately 3:54 p.m., while officers remained in a line at the tunnel defending the Capitol, both the defendant and his co-defendant Michael Roberts emerged from the riotous mob near the south end of the tunnel and then swiftly climbed on top of other rioters in order to move close to the police line defending the tunnel. Markey was wearing a dark colored hat and a shirt. The police officers defending the LWT tunnel were readily identifiable as police officers, wearing police uniforms, badges, and marked police helmets; some additionally carried police riot shields. The defendant and Roberts both knew those officers were police officers who were engaged in their official duties protecting the Capitol. From his elevated vantage

atop those other rioters, Markey began forcibly assaulting those police officers and making physical contact with them.

11. Initially, Markey wielded a police baton, but even after losing hold of the baton, he continued to swing at officers in a further attempt to strike them. Several seconds later, his co-defendant Michael Tyler Roberts, wearing a red sweatshirt, emerged from the riotous mob on the south side of the tunnel beside Markey. Like the defendant, Roberts climbed on top of other rioters and used his vantage there to repeatedly assault the police officers defending the Capitol building.

12. Markey moved closer to the police line and forcibly struck a police shield held by two MPD officers with his hands. He also began to pull on the police shield held by those officers. Markey then balanced himself standing on top of other rioters, grabbed the shield held by MPD officers again, spoke to them, and then proceeded to forcibly kick the shield several times with considerable force. Another MPD officer used a pole to attempt to deter Markey's assault on those officers, until Markey pulled the pole from that officer's grasp. Markey pointed at the officer and screamed, "Oath breaker! Oath breaker! You're not doing your fucking job. Listen! I fought for this fucking country!"

13. Markey then used the pole he wrested from one police officer to strike the shield held by other MPD officers. Markey assaulted those officers with the pole by striking them with it seven distinct times, and did so with such force than on the seventh strike the pole broke. Markey struck the shield held by the police officers one final time before discarding the remaining piece. Markey continued his assault on the officers, yelling at them, striking and pushing their shield with his hands, and turning it parallel to the ground to render it ineffective.

14. Markey's assault of the officers at the tunnel on the LWT of the U.S. Capitol building on January 6, 2021, lasted from approximately 3:54 p.m. until 3:57 p.m.

*Elements of the Offense*

15. The parties agree that 18 U.S.C. §§ 111(a)(1) and (b) requires the following elements:

   a. First, the defendant assaulted officers from the Metropolitan Police Department;

   b. Second, the defendant did such acts forcibly;

   c. Third, the defendant did such acts voluntarily and intentionally;

   d. Fourth, the officers assaulted were assisting officers of the United States who were then engaged in the performance of their official duties;

   e. Fifth, in doing such acts, the defendant intentionally used a deadly or dangerous weapon.

*Defendant's Acknowledgments*

16. The defendant knowingly and voluntarily admits to all the elements as set forth above. Specifically, the defendant admits that he forcibly, knowingly, and intentionally assaulted MPD police officers; that those officers were assisting officers of the United States who were engaged in the lawful performance of their official duties at the time of that assault; that the defendant made forcible physical contact by means of a dangerous weapon (namely, a pole). In addition, the defendant admits that he acted with the intent of obstructing and impeding those officers while they were engaged in the lawful performance of their duties during a civil disorder that both obstructed commerce and the performance of a federally protected function. The defendant further admits that he intentionally used a dangerous weapon during the assault on the police officers (namely, a pole); that the assault on the police officers was motivated by their status as government employees; and that he used violence and the credible threat of violence in the commission of this offense.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:     /s/ Julie Bessler
         Julie Bessler
         Assistant United States Attorney
         PA Bar No. 328887
         601 D Street, N.W.,
         Washington, DC 20004
         Julie.Bessler@usdoj.gov
         (202) 809-1747

         Craig Estes
         Assistant U.S. Attorney Detailee
         John Joseph Moakley Federal Courthouse
         1 Courthouse Way
         Boston, MA 02210
         craig.estes@usdoj.gov
         (617) 748-3100

## DEFENDANT'S ACKNOWLEDGMENT

I, Richard Markey, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 4/12/24

Richard Markey
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 4/24/24

Jerry Ray Smith, Jr.
Attorney for Defendant