UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )( | |
| )( | **Criminal No. 23-417-01 (APM)** |
| v.    )( | **Judge Mehta** |
| )( | **Sentencing: December 6, 2024** |
| RICHARD MARKEY    )( | |

## MEMORANDUM IN AID OF SENTENCING

COMES NOW the defendant, Richard Markey, by and through undersigned counsel, and respectfully provides the following information to aid the Court in determining the appropriate sentence for him:

1. On July 17, 2023, Mr. Markey was arrested in this case in connection with the events at the U.S. Capitol on January 6, 2021. See Presentence Investigation Report (ECF No. 42) (PSR) at 1. After his arrest, Mr. Markey was released on bond. See id.

2. On November 29, 2023, an eleven-count indictment was filed against Mr. Markey and his codefendant, Michael Roberts. Indictment (ECF No. 16).

3. On August 19, 2024, Mr. Markey pled guilty to count three of the Indictment: Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon (18 U.S.C. §§ 111(a)(1) and (b)). See Plea Agreement (ECF No. 33) at 1; PSR at 3. Given the charge he pled guilty to, Mr. Markey had to be detained pending imposition of his sentence. 18 U.S.C. §§ 3142(f) and 3143(a)(2); see also Plea Agreement at 6. His sentencing is scheduled for December 6, 2024.

4. The appropriate sentence for Mr. Markey is 20 months incarceration followed by a period of supervised release. This sentence would be a downward variance from Mr. Markey's Guidelines range of 46-57 months. Nevertheless, it is an appropriate sentence for Mr. Markey under 18 U.S.C. § 3553(a).

1

## DISCUSSION

In determining an appropriate sentence for a defendant, the Court is to consider the factors spelled out in 18 U.S.C. § 3553(a). These factors are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   (B) to afford adequate deterrence to criminal conduct;

   (C) to protect the public from further crimes of the defendant;

   (D) to provide the defendant with needed with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kind of sentences available;

(4) the kinds of sentence and the sentencing range established… [by the Sentencing Guidelines];

(5) any pertinent policy statement… issued by the Sentencing Commission…;

(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). In consideration of the above factors, a sentence of 20 months incarceration followed by a period of supervised release is the appropriate sentence for Mr. Markey.

### Nature and Circumstances of the Offense

In connection with his plea of guilty in this case, Mr. Markey agreed to a Statement of Offense (ECF No. 34). In this document, the conduct establishing Mr. Markey's guilt

under 18 U.S.C. §§ 111(a) and (b) is described. Statement of Offense at 4-5. As described, the conduct occurred on January 6, 2021 between 3:54 p.m. and 3:57 p.m. at the mouth of the entrance tunnel into the U.S. Capitol off the Lower West Terrace of the building (the "tunnel"). Id. The conduct at issue was actually captured on a CCTV surveillance camera that was in the tunnel at the above-referenced date and date. Footage from the camera was provided to Mr. Markey in discovery. A review of the footage shows that, at 3:54:30 p.m., Mr. Markey approached the mouth of the tunnel and climbed onto the backs of rioters who were already facing off with police officers there. The officers were using riot shields to protect themselves from the rioters. While lying prone on the backs of the rioters facing off with the police, Mr. Markey reached out at the officers with his bare hands and then struck a police riot shield that officers were holding up at head level several times with his right hand. Then, after managing to somehow stand up on the backs and shoulders of the rioters he had climbed up on, he gestured and yelled at the officers. An officer who had a long, thin stick swing the stick at Mr. Markey and hit him with it two times. As the stick hit him the second time, Mr. Markey grabbed the end of it. The stick was not particularly sturdy, and it broke in the middle as Mr. Markey and the officer struggled over it. Mr. Markey then grabbed the broken half of the stick that was nearest to him and used it to strike the riot shield that he had previously struck with his hand. He struck the riot shield seven times with the stick. All of his strikes with the stick were directed at the shield. None of the strikes hit anywhere but the shield, and no officer was ever directly hit with the stick. After hitting the shield seven times with his stick, Mr. Markey discarded it. After this, he grabbed at the shield a few times with his bare hands and continued to yell and gesture at the officers. At around 3:56:40 p.m., he dropped down

into the rioters whose backs and shoulders he had been standing on and disappeared into the crowd. His above-described interaction with the police at the mouth of the tunnel lasted just slightly over two minutes. There is no evidence that any officer suffered even minor injuries because of Mr. Markey's actions. Though Mr. Markey's conduct was inexcusable, the fact that he directed his strikes with the stick at the riot shield and did not hit any officers directly with it militates in favor of giving him a lesser sentence than would be appropriate for a defendant who uses a dangerous weapon to make direct contact with an officer—or to even try to make direct contact with an officer.

### History and Characteristics of the Defendant

Mr. Markey is 40 years old. PSR at 2, 10. He is married and has two children, a 13-year-old girl and a 10-year-old boy. See id. at 11. When he was in his early twenties, Mr. Markey served in the United States Coast Guard for three years and was stationed in Maine. See id. at 11, 13. Apart for that, he is a life-long resident of Connecticut. See id. at 11. Mr. Markey was raised in a stable and close-knit two-parent family and has three sisters, all with successful careers. See id. at 10. Mr. Markey graduated high school in 2003. See id. at 12. He has been always been gainfully employed ever since he was in high school. While in high school, Mr. Markey worked in landscaping. After high school but before he went into the Coast Guard, he worked as an aide in daycare facility and then doing maintenance and groundskeeping for the City of Thomaston, Connecticut. See id. at 13. After getting out of the Coast Guard, Mr. Markey worked as an HVAC technician for two years and then, after that, as both a plumber and an HVAC technician. See id. at 12-13. In this latter capacity, Mr. Markey has worked for the same company up until his incarceration in this case in August 2024, which means roughly for the past 15 years. See id. at 12. Mr. Markey has worked hard to build a good life for his family. Throughout his career, Mr. Markey has sought to advance himself and increase his earning potential,

attending school to get his HVAC qualifications and then later to get his plumbing qualifications.  See id.  He and his wife were able to buy a home, see id. at 13, and Mr. Markey is very involved in his children's lives.  Among other things, he has always been very active in his children's sporting endeavors and has often served as a coach in their various youth league teams.  See id. at 11.  Being a coach, has not only allowed Mr. Markey to support his children and spend time with them; it has also allowed him the contribute to his community, which is important to him.  See id.  Mr. Markey's arrest in this case was his first-ever arrest  See id. at 9-10.

After the events of January 6, 2021, Mr. Marky returned home to Connecticut.  There are no indications that has been involved in any criminal activity since then.  Moreover, there are no indications that he has even been involved in any political activities since then—including online activities.  After his arrest in July 2023, Mr. Markey was on release until he pled guilty in August 2024.  He remained in full compliance with his release conditions that entire time.  In pleading guilty, Mr. Markey has accepted responsibility for his actions.

A large number of people have felt it important to come forward and write letters on Mr. Markey's behalf.  These letters are being submitted as an attachment to this sentencing memorandum.  Attachment, Letters of Support.  These letters are written by family members, friends, neighbors, employers, and people in the community who Mr. Markey has helped or who know him through his coaching youth sports.  The letters consistently describe Mr. Markey as a devoted family man and as someone who is extremely generous, kind, and helpful both to his neighbors and to people in the community generally, even to the point of providing his labor and skills as a plumber and HVAC technician to people free of charge.  In one letter, Mr. Markey is described as the kind of person "who would give the shirt off his back to help a stranger," and this same sentiment is uniformly reflected in all the other letters as well.  It is clear from the letters—especially the letters from people who know Mr. Markey through his coaching, including

parents whose children he has coached—that Mr. Markey derives real enjoyment from working with children and is very good at it. In the letters, Mr. Markey is repeatedly referred to as "Coach Rick" or "Coach Ricky"—an appellation that, especially coming from the parents of children he has coached, shows how much he is trusted in his community. It is submitted that the Letters of Support, written by people who know Mr. Markey, provide a more accurate and complete picture of him than do the PSR, the government's sentencing memorandum, or even this memorandum.

Given the above, Mr. Markey's history and characteristics warrant giving him a lenient sentence.

**The Need for the Sentence Imposed (A) to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense; (B) to Afford Adequate Deterrence to Criminal Conduct; and (C) to Protect the Public from Further Crimes of the Defendant**

It is not possible to argue that the events at the Capitol on January 6 were not serious and disturbing. The fact that Mr. Markey allowed himself to get caught up in those events and assault police officers admittedly warrants punishment. However, in evaluating Mr. Markey's criminal conduct on January 6, it is important to take note of its very short duration (just slightly over two minutes) and the fact that he only struck a police riot shield—and not any officers directly—with the stick that he used to commit the assault. Moreover, Mr. Markey has pled guilty and accepted responsibility for his actions. Accordingly it is submitted that a sentence of 20 months incarceration reflects the seriousness of Mr. Markey's criminal conduct and is sufficient to promote respect for the law and provide just punishment for his conduct. Additionally, it is submitted that a sentence of 20 months is more than enough to deter Mr. Markey from engaging in future criminal activity and to protect the public from him. Mr. Markey was 38 years old at the time of the conduct he pled guilty to. He had no contact with the police or the criminal-justice system at all prior to this. Since then, he has not been involved in any criminal

conduct either. He has been a hard-working and contributing member of society all his life. He is a model family man and community member. His conduct in this case must be viewed as anomalous. While he has been on bond in this case, he has been in perfect compliance with his release conditions. He has a very supportive family and many friends who stand behind him. Given all this, it seems to safe to say that the risk of Mr. Markey engaging in future criminal activity is extremely low regardless of what sentence the Court sees fit to give him in this case.

## Sentencing Guidelines

As part of his plea agreement in this case, the parties agreed that Mr. Markey's Guidelines sentencing range is 46-57 months. Plea Agreement at 4. The Probation Office concurs in the parties' determination. PSR at 14. As part of his plea agreement, Mr. Markey retains the right to seek a downward variance from his Guidelines range. Plea Agreement at 4. Mr. Markey submits that, for all the reasons discussed in this memorandum, a downward variance from his Guidelines range to 20 months is appropriate under 18 U.S.C. § 3553(a).

## The Need to Avoid Unwarranted Sentencing Disparities

In <u>United States v. Ryan Samsel et al.</u>, 21-cr-537 (JMC), defendant James Grant was found guilty at trial on one count of Assaulting, Resisting, or Impeding Certain Officers, Using a Dangerous Weapon, Inflicting Bodily Injury, and Aiding and Abetting under 18 U.S.C §§ 111(a)(1) and (b), 2. He was also found guilty of one count under 18 U.S.C. § 231 and four counts under 40 U.S.C. § 5104. Judgment (ECF No. 430) at 1-2. According to the government's sentencing memorandum for Mr. Grant, he and codefendant Samsel led the very first breach of the bike-rack barricade demarcating the restricted area outside the U.S. Capitol on January 6, and "[h]undreds of protestors followed [their] lead." Government Sentencing Memorandum (ECF No. 416) at 6. Once

inside the restricted area, Mr. Gant along with Mr. Samsel approached a group of officers behind a second bike-rack barricade.  Disobeying direct orders from the officers, Mr. Gant, Mr. Samsel, and three other persons forcibly pulled two segments of the barricade away from the officers and then, lifting the segments up to head level, "drove the metal bike rack barricades into the officers." Id. at 7-8.  As a result of this, two officers were driven back with such force that their backs hit the stairwell behind them.  A third officer was struck in the face by a bike-rack segment, and the force was such that it caused her to "slam her head twice: first against the metal handrail, then against the steps." Id. at 9. At this point, Mr. Grant then helped another rioter in physically assaulting one of the officers who had been driven back.  Id. at 9-10.  By the time the officer was able to get away, the police were in full retreat from the advancing crowd behind Mr. Grant, and with the crowd, Mr. Grant then moved on to yet another police line, this one on the West Plaza of the Capitol. Id. at11-12.  Mr. Gant then went to the front of the crowd, where he directly pushed on an officer with his back in an effort to breach the line.  Id. at 13-14.  After this line was breached, Mr. Gant approached the building and then entered it by climbing through a smashed-out window.  Id. at 15-16.  He was in the building for 28 minutes, and in addition to common areas, he entered a conference room and then a senator's office, proudly posing for pictures in both locations.  Id. at 17-20.  Mr. Grant was given a total sentence of 36 months.  Judgement at 3.

      One of Mr. Grant's codefendants in the Samsel case (21-cr-537 (JMC)) was Jason Blythe.  Mr. Blythe also went to trial, and like Mr. Grant, he too was found guilty of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, Inflicting Bodily Injury, and Aiding and Abetting under 18 U.S.C §§ 111(a)(1) and (b), 2. Additionally, Mr. Blythe was found guilty of one count under 18 U.S.C. § 231 and one count under 40 U.S.C. § 5104.  Judgment (ECF No. 439) at 1-2.  According to the government's sentencing memorandum for Mr. Blythe, he came to the U.S Capitol on January 6 wearing body armor.  Government's Sentencing Memorandum (ECF No. 406).

8

Once at the Capitol, he followed right behind Mr. Grant and Mr. Samsel when they breached the first bike-rack barricade demarcating the restricted area, and he was with them when they approached the group of officers behind the second bike-rack barricade. Id. at 5. Moreover, he was one of the persons who, along with them, forcibly pulled the two segments of the barricade away from the officers and then drove them into the officers, causing the two officers hit their backs against the stairwell behind them and the third officer, who was hit in the face, to slam her head into the metal handrail and then against the steps. Id. at 5-6. With Mr. Grant, Mr. Blythe then helped the other rioter in physically assaulting one of the officers who had been driven back. Id. at 6-7. With the police in retreat, Mr. Blythe also advanced with the crowd onto the West Plaza of the Capitol. Id. at 7. He then stayed in that general area for at least three and one half hours. Id. at 9. During this time, he was involved in at least two incidents were he personally fought with police officers who were trying to clear the area. Id. at 10-13. At one point, he climbed up in the media tower and waved a flag around. Id. at 8. Mr. Blythe was given a total sentence of 30 months incarceration. Judgment at 3.

In United Sates v. Dale Huttle, 22-cr-403 (CRC), the defendant pled guilty to one count of Assaulting, Resisting, or Impeding Certain Officers Using a Deadly and Dangerous Weapon under 18 U.S.C. §§ 111(a) and (b). Judgment (ECF No. 71) at 1. According to the government's sentencing memorandum, on January 6, Mr. Huttle was with the crowd that approached the Capitol after the "Stop the Steal" rally on the Ellipse. He carried with him a flag pole with an upside-down American flag on it. Government's Sentencing Memorandum (ECF No. 68) at 3. When his codefendant told him that it looked like the police were going to stop the crowd before it could get to the Capitol, Mr. Huttle proposed that they should "bum rush" the police to get into the building. Id. at 4. He then worked his way to the front of the crowd and confronted and berated the officers manning the police line on the West Front of the Capitol grounds. This was around 2:00 p.m. Id. When the crowd then surged forward and pulled the bike-rack barrier away from

the police line, Mr. Huttle "lunged forward towards the officers and forcibly jabbed his flagpole directly into [an officer's] stomach." Id. at 5. The officer lost his footing and fell backwards onto some stairs as Mr. Huttle "continued to strike him with the flagpole." Id. at 6. As a result of all this, the officer slipped a disc in his back. Id. Three and a half years later, the officer still suffers continued back pain and requires "consistent medical treatment." Id. After he finished assaulting the officer he knocked to the ground, Mr. Huttle turned his attention to another officer who had lost his footing as the bike-rack barricade was being pulled away from him. Id. As the officer was trying to regain his balance, Mr. Huttle "stepped forward and forcibly jabbed his flagpole at [the officer], striking him and causing him to fall all the way down the stairs." Id. Then, "[a]s other officers attempted to pull [the officer] to his feet, Huttle continued to jab [those] officers with the flagpole." Id. Mr. Huttle then began verbally berating the officers, and when they retreated, he followed after them, helping the crowd to pin them against a wall. Id. at 7-8. Mr. Huttle approached the pinned officers and "grabbed and yanked [an officer's] gas mask." Id. at 8-9. Then, "as another rioter unloaded a large cannister of chemical irritant at the officers' faces, Huttle grabbed… the baton [of the officer whose gas mask he had yanked] and attempted to yank [that] away from him." Id. at 9-10. He then grabbed another flagpole and stepped towards the officers, but an officer was able to disarm him before he could do anything more with it. Id. at 10-11. Mr. Huttle remained on the Capitol grounds until after 5:00 p.m. Id. at 11. Mr. Huttle was given a total sentence of 30 months incarceration. Judgment at 2.

Thomas Patrick Hamner, 21-cr-689 (ABJ) had a "stipulated trial" at which he was found guilty on one count of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon and Aiding and Abetting under 18 U.S.C. §§ 111(a)(1) and (b), 2. Judgment (ECF No. 59) at 1. As part of that stipulated trial, Mr. Hamner agreed to a Statement of Elements and Facts for Stipulated Trial (Statement) (ECF No. 59-1). In the Statement, he agreed that, on January 6, he was present on the West Plaza of the Capitol

wearing a sweater that said "Guns Don't Kill People, Clintons Do" and a black helmet.  Id. at 3-5.  While on the West Plaza, he fought with police officers manning a bike-rack barricade.  Id. at 5.  At some point, "rioters moved a large metal 'TRUMP' sign towards the police line.  The sign was encased in an all-metal sign frame, approximately eight feet tall and 10 feet wide, welded with screws, and supported by large casters that were approximately the size of a man's head."  Id. at 5.  After the sign was moved towards the police line, Mr. Hamner "carr[ied] and then push[ed] the sign into the defensive line of officers."  Id. at 9.  In the Statement, Mr. Hamner agreed that he and others "pushed the sign into [an] MPD Officer [] who was in the defensive line of officers."  Id. at 8   He further agreed that, when he did so, the sign "was being used as a deadly or dangerous weapon."  Mr. Hamner was given a total sentence of 30 months.

       The need to avoid unwarranted sentencing disparities weighs in favor of giving Mr. Markey a less severe sentence than the sentences given to Messrs. Grant, Blythe, Huttle, and Hamner.  Both Mr. Grant and Mr. Blythe took their cases to a trial, and both were found guilty not only of assaulting a police officer with a dangerous weapon but of other crimes as well.  Moreover, both of them employed the dangerous weapon they used to perpetrate the assault (a metal bike-rack barricade) to make direct contact with several officers, and both caused injuries to at least one officer.  Also, their illegal conduct at the Capitol on January 6 was far more extensive and of a greater duration than Mr. Markey's.  Mr. Huttle, who, like Mr. Markey, pled guilty to one count of assaulting a police officer with a dangerous weapon readily compares to Mr. Markey—especially since he used a flagpole to perpetrate the assault.  But he directly struck multiple officers with the flagpole in multiple instances.  In one instance, he gouged an officer in the stomach and knocked him into some stairs, causing him long-term injury in the form of slipped disc in his back, and in another, he knocked an officer all the way down some stairs.  Then, he assaulted officers who were helping that officer with his flagpole.  In an altogether separate assault, he helped other rioters trap officers against a wall, and he then yanked an officer's gas

11

mask as another rioter released a gas cannister at the officers. His illegal conduct at the Capitol on January 6 was also far more extensive and of greater duration than Mr. Markey's. Finally, Mr. Hamner lifted a very large welded metal sign with casters the size of a man's head and drove it into a line of officers. In assaulting the officers like this, he created a far greater danger of physical harm than did Mr. Markey by striking a stick against a riot shield that officers were holding. Mr. Grant got 36 months incarceration; and Mr. Blythe, Mr. Huttle, and Mr. Hamner all got 30 months incarceration. Given that Mr. Markey's conduct was not as egregious as the conduct of any of these four men, a sentence of 20 months incarceration for him is consistent with the need to avoid unwarranted sentencing disparities.

## Conclusion

In consideration of the above, Mr. Markey submits that a sentence of 20 months incarceration followed by a period of supervised release is the appropriate sentence for him in this case.

WHEREFORE the defendant, Richard Markey, provides the above information to aid the Court in determining the appropriate sentence for him.

Respectfully submitted,

\_\_\_\_/s/_____
Jerry Ray Smith, Jr.
D.C. Bar No. 448699
Counsel for Richard Markey
717 D Street, N.W.
Suite 310
Washington, DC 20004
E-mail: jerryraysmith@verizon.net
Phone: (202) 641-4211